**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

                                     Case No.  04-30291

PATRICK JOSEPH SEDLACEK

        Debtor


        WebMD PRACTICE SERVICES, INC.

        Plaintiff

        v.                                Adv. Proc. No.  04-3196

PATRICK JOSEPH SEDLACEK

        Defendant


**MEMORANDUM ON
<u>MOTION FOR SUMMARY JUDGMENT</u>**


**APPEARANCES:**    BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
        James A. McIntosh, Esq.
        Post Office Box 1792
        Knoxville, Tennessee  37901
        Attorneys for Plaintiff

        RICHARD M. MAYER, ESQ.
        Landmark Center
        South Tower, Suite S-570
        1111 Northshore Drive
        Knoxville, Tennessee 37919
        Attorney for Defendant/Debtor


**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

On August 24, 2004, the Plaintiff, WebMD Practice Services, Inc., formerly known as Medical Manager Health Systems, Inc., filed its Complaint Objecting to Discharge of Debt (Complaint), requesting a judgment against the Defendant/Debtor in an amount to be determined by the court, along with a determination of nondischargeability pursuant to 11 U.S.C.A. § 523(a)(2)(A) and/or (4) (West 2004).  Additionally, although the Complaint was filed after the May 3, 2004 deadline, the Plaintiff argued that it was not properly scheduled, did not have notice, and therefore, had a nondischargeable debt cognizable under 11 U.S.C.A. § 523(a)(3)(B) (West 2004).  The Debtor filed his Answer to Complaint on October 20, 2004, defending the Plaintiff's averments solely on the grounds that the Complaint was not timely filed because the Plaintiff was listed in the Debtor's statements and schedules and received notice of the bankruptcy case through its attorney.  He did not answer or otherwise aver any defense regarding the facts pled by the Plaintiff in support of its nondischargeability claim under § 523(a)(2)(A) or (4).

On January 19, 2005, the Plaintiff filed a Motion for Summary Judgment, asking the court to grant it a nondischargeable judgment based upon the Debtor's failure to respond to its allegations of fraud.  The Debtor filed his Response to Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment on February 3, 2005, again responding only to the § 523(a)(3)(B) issue and asking for summary judgment on the basis that the Complaint was not timely filed.  On March 1, 2005, the court entered an Order summarily denying both motions because genuine issues of material fact existed, and scheduled a trial for April 5, 2005.

By Order entered March 18, 2005, the court bifurcated the trial in order to first determine whether the Plaintiff had notice or actual knowledge of the Debtor's bankruptcy case in time to timely request a determination of dischargeability under § 523(a)(2), (4), or (6), thus bringing its claim within the purview of § 523(a)(3)(B).  The trial of the notice issue was held on April 5, 2005, and on April 19, 2005, the court entered an Order holding that the Plaintiff did not have notice or actual knowledge of the Debtor's case, and that it was therefore allowed to proceed with its dischargeability action under 11 U.S.C.A. § 523(a)(3)(B).[1]  A scheduling conference was held thereafter on May 5, 2005, on the § 523(a)(2)(A) and (4) dischargeability issues.

At the May 5, 2005 scheduling conference, the Plaintiff moved in open court that it be allowed to renew its January 19, 2005 Motion for Summary Judgment on the dischargeability issues.[2]  The court, without objection from the Debtor, granted the Plaintiff's oral motion pursuant to an Order entered on May 9, 2005, which Order also directed that the court would consider the following evidence in conjunction with ruling on the Motion for Summary Judgment:  (1) all pleadings, depositions, and affidavits submitted by the parties pursuant to Rule 56(c) of the Federal Rule of Civil Procedure in support of

---

[1] The court also filed a Memorandum on 11 U.S.C.A. § 523(a)(3)(B) (West 2004) Notice Issue on April 19, 2005, detailing the bases for its decision.

[2] Although the court summarily denied the parties' respective summary judgment motions on March 1, 2005, it advised the parties from the bench in hearings held subsequent to March 1, 2005, of the court's belief that the dischargeability issues were capable of resolution by summary judgment but that the underlying facts surrounding the notice issue under § 523(a)(3)(B), for which material issues of fact existed and the resolution of which was fundamental to the Plaintiff's entitlement to proceed under § 523(a)(2)(A) and/or (4) dischargeability issues.

3

and in opposition to their prior summary judgment motions; (2) the Request for Admissions

Propounded to Patrick Joseph Sedlacek served by the Plaintiff on the Debtor on January 10,

2005, together with the Defendant's Response to Request for Admissions served by the

Debtor on the Plaintiff on February 3, 2005; and (3) all material evidence introduced at the

April 5, 2005 trial on the notice issue. Additionally, the court allowed the parties ten days

to supplement the record in the manner required by Rule 56(c) of the Federal Rules of Civil

Procedure in further support of their positions relative to the Plaintiff's Motion for Summary

Judgment and/or to File Supplemental Briefs.[3] Finally, the court allowed the parties ten

days to object to the May 9, 2005 Order. No objections were filed.

The Motion for Summary Judgment is supported by a Memorandum of Law, as

required by E.D. Tenn. LBR 7007-1, together with the following documents and exhibits:

(1) the Affidavit of Michael Glick, attaching the Amended Complaint for Money Damages

and Writ of Possession filed on March 31, 2003, in the Circuit Court for Knox County,

Tennessee and Exhibits A through E; (2) the Affidavit of Dennis P. Waggoner dated

January 7, 2005, and attachments; (3) the Affidavit of Harold E. Guldin, Jr. and

attachments; (4) the Affidavit of Bradley Holt and attachments; (5) the Affidavit of Paul

Holt; (6) the Affidavit of Merrill Holt; (7) the Affidavit of Stephen W. Myers and

attachments; (8) the Affidavit of D.B. Snyder and attachments; (9) the Affidavit of Wyatt

E. Harper, III and attachments; (10) the Affidavit of Kendall S. Layman and attachments;

---

[3] On May 16, 2005, the Plaintiff filed the Supplemental Memorandum in Support of Motion for Summary Judgment of WebMD Practice Services, Inc. The Debtor did not file any additional Rule 56(c) documents or a brief.

(11) the Affidavit of David Scollo and attachments; (12) the Affidavit of Dennis P. Waggoner dated January 11, 2005, attaching the transcript of the deposition of Richard D. Williams taken October 28, 2004; (13) the Affidavit of Joe Beyer; (14) the transcript from the Motion for Application for Writ of Attachment held on June 12, 2003, in the Circuit Court for Knox County, Tennessee; (15) the Affidavit of Stephen G. Anderson and attachments; (16) the Statements and Schedules filed by the Debtor in his bankruptcy case; (17) the transcript of the Debtor's January 26, 2005 deposition and exhibits; (18) the Request for Admissions Propounded to Patrick Joseph Sedlacek served by the Plaintiff on January 20, 2005; and (19) the Defendant's Response to Request for Admissions served by the Debtor on February 3, 2005.  Also before the court is the record arising from the April 5, 2005 trial with respect to the notice aspect of this bifurcated adversary proceeding, consisting of a Stipulation filed March 30, 2005, sixteen stipulated exhibits, and the testimony of three witnesses, Leila Turner, Robert R. Carl, and the Debtor.  As previously noted, the Debtor did not file additional documentation in opposition to the Plaintiff's renewed Motion for Summary Judgment.[4]

This is a core proceeding.  28 U.S.C.A. § 157(b)(2)(A), (I), and (O) (West 1993).

---

[4] In fact, the only documents filed by the Debtor were a letter and Amended Chapter 7 Individual Debtor's Statement of Intention, both of which were appended to the Defendant's Response to Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment filed on February 3, 2005.  Both of these documents relate solely to the § 523(a)(3)(B) notice issue already resolved by the court, and have no relevancy to the present dischargeability issue.  In effect, the Debtor has not produced any evidence to refute the proof presented by the Plaintiff in support of the § 523(a)(2)(A) and (4) dischargeability issues presently before the court on the Plaintiff's Motion for Summary Judgment.

**I**

In the early months of 2000, the Plaintiff, a leading provider of practice management software and services for physicians, employed the Debtor as a senior member of its acquisition team, authorizing him to research and negotiate mergers and acquisitions and to set up new independent dealers on the Plaintiff's behalf.  The Debtor's responsibilities included analyzing financial and strategic value, advising the Plaintiff of the purchase price for potential acquisitions, and closing the deals.  The Plaintiff estimates that it paid close to $17,000,000.00 to acquire independent dealers brought to it by the Debtor.

The Plaintiff terminated the Debtor's employment on December 30, 2002.  As a basis for his termination, the Plaintiff believed that the Debtor fraudulently misrepresented to the Plaintiff the value of businesses that it acquired through the Debtor's efforts and diverted the inflated amounts, totaling $2,228,200.00, into the following consulting businesses established by the Debtor for the purpose of defrauding money from the Plaintiff:  Strategic Resource Group, Infinity Consulting Group, Patrick J. Sedlacek Consulting, Arrow Consulting, and Aero Consulting.  The Plaintiff also believed that the Debtor submitted false and duplicate expense reports for payment and that it paid $8,379.56 in such "reimbursed" expenses.

In 2003, the Plaintiff filed a lawsuit against the Debtor in the Circuit Court for Knox County, Tennessee, styled *Medical Manager Health Systems, Inc. v. Sedlacek* and assigned Civil Action No. 3-42-03 (State Court Lawsuit).  In March 2003, the Plaintiff amended its

6

complaint, requesting money damages and a Writ of Possession in order to recover from the
Debtor all computer hardware and software he obtained through his employment with the
Plaintiff, along with any other files, records, or other property belonging to the Plaintiff.
The Debtor did not respond to any of the Plaintiff's allegations that the Debtor obtained the
Plaintiff's money and property through fraud and intentional misrepresentations, and that
he submitted and received money for false expense reports.  The hearing on the Writ of
Possession was held on June 12, 2003, and although he attended the hearing, the Debtor,
asserting his Fifth Amendment rights against self-incrimination, did not answer questions
concerning the alleged embezzlement of funds.  On May 21, 2003, a Temporary Injunction
was issued, prohibiting the Debtor "from selling, transferring, encumbering or removing
from the court's jurisdiction any of his real or personal property, including cash and bank
deposits . . ." except as necessary for ordinary living expenses or payment of monthly bills.
APR. 5, 2005 TRIAL EX. 13.

The Debtor filed the Voluntary Petition commencing his Chapter 7 bankruptcy case
on January 22, 2004, and the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors,
& Deadlines issued by the United States Bankruptcy Court Clerk's Office on January 27,
2004, setting forth the date for the meeting of creditors and pertinent deadlines, was mailed
to the Debtor's creditors, pursuant to his creditor matrix, including "Medical Manager Health
System, c/o Stephen Anderson, 900 Gay Street, 42200, P.O. Box 1792, Knoxville, TN

37901."[5] APR. 5, 2005 TRIAL EX. 2.  Following the expiration of the May 3, 2004 deadline for

filing complaints objecting to discharge or to determine the dischargeability of debts, the

Debtor received a discharge on June 2, 2004.  The Discharge Order was served on all parties

in interest, including the Plaintiff at the above address.   In its April 19, 2005 Memorandum,

the court found that this address was not sufficient because it listed an incorrect suite

number for Mr. Anderson's law firm, did not contain the full street name, included an

unknown addressee at the listed address, and listed both a street address and post office box

address, both of which have different zip codes.  Specifically, the court held that

> [d]esignation of the Plaintiff as the addressee, the fact that both a street
> address and post office box address are listed, but only the post office box zip
> code is reflected, coupled with the incorrect suite number, establish
> ambiguities that the Debtor did not refute, thereby leading the court to
> conclude that there is a real likelihood that Mr. Anderson did not receive the
> Chapter 7 Notice, despite the absence of returned mail to the clerk's office.
> The court cannot presume delivery by the post office of an item placed in the
> mail under the name of an unfamiliar addressee with two different addresses
> listed.

APR. 5, 2005 MEM. OP. at 24.

## II

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c) (applicable

---

[5] Mr. Anderson and the law firm of Baker, Donelson, Bearman & Caldwell were the Plaintiff's attorneys
of record in the State Court Lawsuit.

to adversary proceedings under Federal Rule of Bankruptcy Procedure 7056).   When
deciding a motion for summary judgment, the court does not weigh the evidence to
determine the truth of the matter, but instead, simply determines whether a genuine issue
for trial exists.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).

The moving party bears the initial burden of proving that there is no genuine issue
of material fact, thus entitling it to judgment as a matter of law.  *Owens Corning v. Nat'l
Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2001).   The burden then shifts to the
nonmoving party to produce specific facts showing a genuine issue for trial.  *Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986) (citing FED. R. CIV. P.
56(e)).   The nonmoving party must cite specific evidence and may not merely rely upon
allegations contained in the pleadings.  *Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th
Cir. 2000).   The facts and all resulting inferences are viewed in a light most favorable to the
non-moving party, *Matsushita*, 106 S. Ct. at 1356, whereby the court will decide whether
"the evidence presents a sufficient disagreement to require submission to a jury or whether
it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 106 S. Ct. at
2512.   "[O]nly disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment."  *Anderson*, 106 S.
Ct. at 2510.

### III

In its Motion for Summary Judgment, the Plaintiff asks the court to award it a nondischargeable judgment against the Debtor under one of the two following statutory bases for objecting to the dischargeability of a debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

11 U.S.C.A. § 523(a) (West 2004). The Plaintiff bears the burden of proving each of the elements of nondischargeability by a preponderance of the evidence, *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991), as § 523(a) is construed strictly against the Plaintiff and liberally in favor of the Debtor. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). Furthermore, it is within the jurisdiction and authority of the bankruptcy court to adjudicate the Plaintiff's claims and determine damages. *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 792 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)).

### A

The Plaintiff first asks the court to enter a judgment pursuant to § 523(a)(4). To satisfy this subsection, the Plaintiff must prove that the Debtor obtained the indebtedness

owed to the Plaintiff in one of three ways:  through embezzlement, through larceny, or through fraud or defalcation while acting in a fiduciary capacity.  For the purposes of § 523(a)(4), and as it relates to this case, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996); *Rentrack Corp. v. Neal (In re Neal)*, 300 B.R. 86, 92 (Bankr. M.D. Ga. 2003).  A prima facie case of embezzlement requires the following three elements:  "(1) property owned by another is rightfully in the possession of a bankruptcy debtor; (2) the bankruptcy debtor appropriates such property to a use other than the use for which the property was entrusted to the bankruptcy debtor; and (3) circumstances indicating fraud." *U-Save Auto Rental of Am. v. Mickens (In re Mickens)*, 312 B.R. 666, 680 (Bankr. N.D. Cal. 2004).  It does not require the existence of a fiduciary relationship.  *Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003).[6]

---

[6] Larceny, which is "[t]he unlawful taking and carrying away of property of another with intent to appropriate it to use inconsistent with latter's rights[,]" BLACK'S LAW DICTIONARY 881 (6th ed. 1990), occurred if the Debtor wrongfully and with fraudulent intent took property from its rightful owner. *Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483 (Bankr. W.D. Tenn. 1993) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991)).  Embezzlement differs from larceny because the embezzler's initial acquisition of the property at issue is lawful.  *Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja)*, 259 B.R. 629, 632 (Bankr. N.D. Ohio 2001).  Here, because the Debtor's employment with the Plaintiff included negotiation and closing acquisitions, his initial holding of the disputed funds was not unlawful.

The third option under § 523(a)(4), defalcation while acting in a fiduciary capacity, is also not applicable in this case.  The Sixth Circuit requires the following proof in order to establish a prima facie case of defalcation under § 523(a)(4):  "1) a fiduciary relationship; 2) breach of that fiduciary relationship; and 3) a resulting loss."  *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir. 1997).  Additionally, in order to prove a fiduciary relationship, "the debtor must hold funds in trust for a third party."  *Garver*, 116 F.3d at 179.  Therefore, "the defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor."  *Garver*, 116 F.3d at 180.

"Both the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence." *Goodmar, Inc. v. Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky. 2004) (quoting *Bailey v. James (In re James)*, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984)); *see also Estate of Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 779 (Bankr. E.D. Pa. 2004) (holding that fraudulent intent can be deduced by examining "the facts and circumstances surrounding the act.") (quoting *C & J Rentals, Inc. v. Purdy (In re Purdy)*, 231 B.R. 310, 312 (Bankr. E.D. Mo. 1999)).  Additionally, to prove fraudulent misappropriation, the Plaintiff must prove "'fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876-77 (Bankr. D. Colo. 2004) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (1986)).

The Plaintiff provided affidavits and other documentation in support of its nondischargeability arguments, establishing that the Debtor's fraud, embezzlement, and material misrepresentations were accomplished in the following manner.  The Debtor, individually and along with Mr. Robert Davids, another of the Plaintiff's employees, contacted and later met with the owners of the prospective companies to be purchased by the Plaintiff.  Because the Debtor's position with the Plaintiff included acquisitions, his meetings and initial negotiations with these clients were lawful.  In each instance, the Debtor informed the various owners that technology or consulting fees would have to be paid to a separate company, but that the purchase price would be increased so that, in essence, the Plaintiff was paying the fees.  Additionally, in instances where the owners were

12

directed to pay consulting fees, each was provided with an invoice from the Debtor and/or Mr. Davids. The particulars with respect to these companies is further detailed in the following paragraphs:

With respect to the Plaintiff's acquisition of Turnkey Business Systems, Inc., Perfect Business Forms, Inc., and Business Information Systems and Services, Inc., the initial purchase price was $1,100,000.00. MOT. EX. 3 (Guldin Aff. ¶ 5). The purchase price was then increased to $1,975,000.00 to include a consulting fee of $875,000.00, to be paid to the Debtor. MOT. EX. 3 (Guldin Aff. ¶ 6). The sale closed on September 23, 1999, and Mr. Guldin, the sole shareholder of these companies, received $1,475,000.00 cash and $500,000.00 in Medical Manager stock. MOT. EX. 3 (Guldin Aff. ¶ 7). Thereafter, on September 27, 1999, Mr. Guldin wired $875,000.00 into the Debtor's personal bank account. MOT. EX. 3 (Guldin Aff. ¶ 8).

With respect to the Plaintiff's acquisition of Midsouth Business Systems, the initial purchase price quoted to the shareholders, Bradley Holt, Merrill Holt, and Paul Holt, by Mr. Davids was $2,800,000.00, payable in Medical Manager stock; however, the purchase agreement actually received stated a purchase price of $3,800,000.00 in Medical Manager stock. MOT. EX. 4 (B. Holt Aff. ¶¶ 4-5); MOT. EX. 5 (P. Holt Aff. ¶¶ 4-5); MOT. EX. 6 (M. Holt Aff. ¶¶ 4-5). When questioned about the additional $1,000,000.00 in stock, Mr. Davids advised that they would be required to sell the additional shares and transfer the proceeds

to a consulting company used by the Plaintiff to develop technology outside the company.[7] Mot. Ex. 4 (B. Holt Aff. ¶ 6); Mot. Ex. 5 (P. Holt Aff. ¶ 6); Mot. Ex. 6 (M. Holt Aff. ¶ 6). The acquisition of Midsouth Business Systems closed on February 25, 2000. Mot. Ex. 4 (B. Holt Aff. ¶ 8); Mot. Ex. 5 (P. Holt Aff. ¶ 8); Mot. Ex. 6 (M. Holt Aff. ¶ 8). Thereafter, in August 2000, Mr. Davids advised that an asset of Midsouth Business Systems had been undervalued, so the Plaintiff would be sending a check in the amount of $166,024.17 to correct the mistake. Mot. Ex. 4 (B. Holt Aff. ¶ 9); Mot. Ex. 5 (P. Holt Aff. ¶ 9); Mot. Ex. 6 (M. Holt Aff. ¶ 9). The Debtor later advised the Holts to forward $89,000.00 from the $166,024.17 to a separate technology development company, and pursuant to the Debtor's instructions, on August 14, 2000, a check in the amount of $89,000.00 was sent to Aero Consulting.

With respect to the Plaintiff's acquisition of Turnkey Physician Services, Ltd., during negotiations, the owner, Stephen Myers, advised the Debtor that he needed a purchase price of $750,000.00, payable in cash. Mot. Ex. 7 (Myers Aff. ¶ 4). The Debtor advised Mr. Myers that the Plaintiff needed to amortize a $1,200,000.00 consulting fee, and it needed assistance in doing so from several dealerships it was acquiring. Mot. Ex. 7 (Myers Aff. ¶ 5). In order to accomplish this, the Debtor advised Mr. Myers that the Plaintiff would increase the purchase price by approximately $450,000.00, which amount would then be

---

[7] Regarding this increase in the purchase price, the record will only support a finding that in January 2001, Mr. Davids called and advised that it was time to sell the additional stock and that, upon the sale of the stocks, three wire transfers, each in the amount of $76,667.00, were, at Mr. David's instruction, sent to Poseidon Consulting. Mot. Ex. 6 (Aff. M. Holt ¶ 11). The Plaintiff does not seek a judgment against the Debtor relative to these transfers.

paid by Mr. Myers to the consulting firm.  MOT. EX. 7 (Myers Aff. ¶ 7).  Mr. Myers would not

agree to payment of this fee and was subsequently contacted by Mr. Davids, the man he

believed to be the Debtor's boss, who advised that the Plaintiff's board of directors had

approved inclusion of the consulting fee in the purchase price.  MOT. EX. 7 (Myers Aff. ¶¶ 6;

9).  When Mr. Myers expressed his concern with paying such a high consulting fee, Mr.

Davids stated that the purchase price would be reduced to $1,050,000.00, and the

consulting fee would be reduced to $300,000.00.  MOT. EX. 7 (Myers Aff. ¶ 10).  Additional

negotiations ensued concerning a holdback and stock in place of cash, but Mr. Myers agreed

to a final contract reflecting payment of cash in the amount of $775,000.00, a holdback of

$75,000.00, stock, and a consulting fee of $275,000.00.  MOT. EX. 7 (Myers Aff. ¶¶ 12-16).

The sale closed on May 25, 2000, and on June 1, 2000, after receiving an invoice from the

Debtor, Mr. Myers wired $275,000.00 to Arrow Consulting.  MOT. EX. 7 (Myers Aff. ¶¶ 17-

19).

    With respect to the Plaintiff's acquisition of Benchmark Systems, Inc. of Louisiana,

the Debtor and Mr. Davids offered the president, D.B. Snyder, $775,000.00 in cash and

$375,000.00 in stock, resulting in a total purchase price of $1,150,000.00.  MOT. EX. 8

(Snyder Aff. ¶ 5).  The Debtor then advised Mr. Snyder that a consulting fee was required

as a standard part of the acquisition process.  MOT. EX. 8 (Snyder Aff. ¶ 6).  The Debtor also

advised Mr. Snyder that the consulting fee would be covered by allowing him to keep and

use the cash owned by Benchmark Systems, Inc. of Louisiana for this fee.  MOT. EX. 8

(Snyder Aff. ¶ 7).  The final sales agreement indicated the $1,150,000.00 purchase price in

stock and cash, plus $380,000.00, representing the cash owned by the company on the closing date, and a holdback in the amount of $115,000.00.  MOT. EX. 8 (Snyder Aff. ¶¶ 9-10).  The sale closed on September 5, 2000, and on September 11, 2000, Mr. Snyder received an invoice for $380,000.00 from Poseidon Consulting.  MOT. EX. 8 (Snyder Aff. ¶¶ 11-12).  On September 13, 2000, Mr. Snyder wired $300,000.00 to Poseidon Consulting.  MOT. EX. 8 (Snyder Aff. ¶ 13).  Thereafter, on September 18, 2000, Poseidon Consulting, through Mr. Davids, wired $177,200.00 to Arrow Consulting and $5,000.00 to David M. Sedlacek, the Debtor's son.  *See* MOT. EX. 17 (JAN. 26, 2005 SEDLACEK DEP. EX. 7).

With respect to the Plaintiff's acquisition of Business and Professional Computers, a division of Highland Electronics, Inc., the Debtor offered an initial purchase price of approximately $150,000.00.  MOT. EX. 9 (Harper Aff. ¶ 9).  The Debtor then advised that the purchase price would be increased by $175,000.00 to pay a consulting fee.  MOT. EX. 9 (Harper Aff. ¶¶ 10-11).  The acquisition closed on December 29, 2000, for $325,000.00, including the $150,000.00 purchase price, the $175,000.00 consulting fee, and a $15,000.00 holdback.  MOT. EX. 9 (Harper Aff. ¶¶ 13-14; 16).  After receiving an invoice from the Debtor, Business and Professional Computers wired $175,000.00 to Arrow Consulting on January 5, 2001.  MOT. EX. 9 (Harper Aff. ¶¶ 15; 17).

With respect to the Plaintiff's purchase of MooMaw Communications, Inc., d/b/a Computer Master, in the fall of 2001, the Debtor entered into negotiations with its president, Kendall Layman, for its acquisition.  MOT. EX. 10 (Layman Aff. ¶ 3).  The Debtor initially advised Mr. Layman that the purchase price would be $325,000.00; however,

16

Computer Master would be required to pay a $150,000.00 fee to Strategic Resource. Mот. Ex. 10 (Layman Aff. ¶ 4). The Debtor advised Mr. Layman that the former owner of Strategic Resource, which was a former dealer of the Plaintiff acquired in an all-stock transaction, was facing personal problems and a decline in the stock price, so the acquisition team confidentially wanted to infuse funds into the company to assist him. Mот. Ex. 10 (Layman Aff. ¶¶ 7-8). Mr. Layman agreed to pay $100,000.00 to Strategic Resource after the Debtor advised that the Plaintiff would forgive approximately $50,000.00 owed to it by Computer Master, and the sale closed on January 31, 2002. Mот. Ex. 10 (Layman Aff. ¶¶ 6; 9). Shortly after the closing, Mr. Layman received an invoice in the amount of $100,000.00 from Strategic Resource, as well as several telephone calls from the Debtor demanding that he wire the payment. Mот. Ex. 10 (Layman Aff. ¶¶ 10-11). Approximately one month after the sale closed, Mr. Layman wired approximately $85,000.00 to Strategic Resource, and approximately one month later, he wired it the additional $15,000.00. Mот. Ex. 10 (Layman Aff. ¶¶ 12-13); Apr. 5, 2005 Trial Ex. 10.[8] Mr. Layman then received a telephone call from the Debtor in December 2002, reminding him to keep the transfers to Strategic Resource confidential. Mот. Ex. 10 (Layman Aff. ¶ 14).

With respect to Compu-Craft, LLC, the majority owner, David Scollo, was approached by the Debtor in November 2001, concerning acquisition by the Plaintiff, at which time, Mr. Scollo advised that he required a purchase price of $500,000.00. Mот. Ex. 11 (Scollo Aff.

---

[8] Trial Exhibit 10 from the April 5, 2005 trial evidences that on February 7, 2002, $84,988.00 was wired to Strategic Resource Group from MooMaw Communications, and $14,993.00 was wired on March 22, 2002. Accordingly, the actual amount with respect to this transaction was $99,981.00.

¶¶ 3-4).  The Debtor advised Mr. Scollo that he could meet that price through a combination

of cash, accounts receiveable, and stock options.  MOT. EX. 11 (Scollo Aff. ¶ 5).  The Debtor

also advised that the cash component of the acquisition would be increased from

$450,000.00 to $500,000.00 so that Mr. Scollo could transfer $100,000.00 in order to assist

a former dealer of the Plaintiff that had been acquired in an all-stock transaction and was

suffering due to a decline in the stock price; however, this transaction was confidential.

MOT. EX. 11 (Scollo Aff. ¶¶ 6-8).  The sale of Compu-Craft, LLC closed on February 1, 2002,

and a few days later, Mr. Scollo wired $100,000.00 to Strategic Resource.  MOT. EX. 11

(Scollo Aff. ¶¶ 10-12; Invoice); APR. 5, 2005 TRIAL EX. 11.  The Debtor then telephoned Mr.

Scollo in December 2002, to remind him that the transfer must remain confidential.  MOT.

EX. 11 (Scollo Aff. ¶ 13).

　　　　With respect to Benchmark Systems of Washington, Inc., in October 2000, the Debtor

and Mr. Davids met with Joe Beyer, who was the sole shareholder along with his wife,

concerning the Plaintiff's acquisition of the company's assets relating to its distribution of

physician practice management software on behalf of the Plaintiff.  MOT. EX. 13 (Beyer Aff.

¶¶ 2-3).  The sale proposal consisted of $150,000.00 in cash, the forgiveness of $52,000.00

in accounts payable to the Plaintiff, and a consulting fee of $112,500.00, which the Debtor

explained was a valid obligation incurred by the Plaintiff prior to its acquisition by WebMD.

MOT. EX. 13 (Beyer Aff. ¶ 5).  Mr. Beyer was also advised that WebMD was not aware of this

obligation, and they asked him not to discuss it with anyone other than his attorney.  MOT.

EX. 13 (Beyer Aff. ¶ 5).  Mr. Beyer agreed to the purchase price on the condition that he be

provided with satisfactory evidence that the consulting fee, to be paid to Aero or Arrow Consulting, was a bona fide obligation, and in December 2000, he requested a copy of the consulting firm's invoice, an address and telephone number for the consulting firm, and the consulting firm's Federal Tax Identification Number.  MOT. EX. 13 (Beyer Aff. ¶¶ 5-6).  Mr. Beyer did not receive the information he requested, and on January 4, 2001, he was informed by the Debtor that the Plaintiff had decided not to purchase Benchmark Systems of Washington, Inc.'s assets, which Mr. Beyer later sold to another distributor of the Plaintiff's software in June 2002.  MOT. EX. 13 (Beyer Aff. ¶¶ 6-7).

With respect to the Plaintiff's purchase of JMK Computers, on September 13, 2002, AmSouth Bank completed a wire transfer in the amount of $330,000.00 from Nagai S. Rejendran to the bank account for the Debtor d/b/a Infinity Consulting Group.  MOT. EX. 2 (Waggoner Aff. ¶ 5; EX. 1); APR. 5, 2005 TRIAL EX. 12.

With respect to MSC Systems, Inc., d/b/a Physicians Support Network, Inc., the Debtor met with its owner, Richard D. Williams, in the summer of 2000, to discuss acquisition by the Plaintiff.  MOT. EX. 12 (OCT. 28, 2004 WILLIAMS DEP. at page 14, line 17; page 19, lines 3-6).  After due diligence, the Debtor advised Mr. Williams that the purchase price would be $1,200,000.00, which was declined.  MOT. EX. 12 (OCT. 28, 2004 WILLIAMS DEP. at page 19, line 20 through page 20, line 5; page 27, lines 3-12).  In 2001, negotiations resumed, and this time, MSC Systems, Inc. was offered $400,000.00 cash, a promissory note in the amount of $800,000.00 plus 5.5% interest, and repayment of the company's line of credit with Boone National Bank.  MOT. EX. 12 (OCT. 28, 2004 WILLIAMS DEP. at page 47,

lines 5-24).  The sale closed on June 1, 2001.  Mot. Ex. 12 (Oct. 28, 2004 Williams Dep. at

page 51, lines 9-22).  Thereafter, Mr. Williams was contacted by the Debtor to execute an

agreement with Strategic Resource Group for advisory services.  Mot. Ex. 12 (Oct. 28, 2004

Williams Dep. at pages 76-77).  Pursuant to this agreement, MSC Systems, Inc. sent the

following payments, totaling $102,000.00, to Strategic Resource Group:  (1) on June 8,

2001, in the amount of $10,000.00; (2) on June 25, 2001, in the amount of $10,000.00;

(3) on June 28, 2001, in the amount of $15,000.00; (4) on July 6, 2001, in the amount of

$10,000.00; (5) on July 20, 2001, in the amount of $10,000.00; (6) on August 21, 2001,

in the amount of $37,000.00; and (7) on November 30, 2001, in the amount of $10,000.00.

*See* Mot. Ex. 12 (Oct. 28, 2004 Williams Dep. at pages 82-88; Exs. 304-311).

The circumstances detailed by the Plaintiff, regarding the Debtor's role in the

Plaintiff's acquisition of the companies detailed above, stands before the court unrefuted by

the Debtor.

In addition, the Plaintiff contends that the Debtor's failure to respond to its

allegations of fraud in the Complaint means these allegations are deemed admitted under

the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

Specifically, the following averments of fact in the Complaint were not admitted, denied,

or otherwise addressed:

> 10.  Sedlacek established various bogus "consulting" firms for the purpose of
> diverting a portion of the proceeds from WebMD dealer acquisitions to his
> personal own use. . . .

11.  In conspiracy with a few other WebMD employees and certain acquisition targets, Sedlacek misrepresented to WebMD the value of businesses being acquired.  He and others would then induce WebMD to pay more than fair value for the businesses.  The excess payments by WebMD were split between Sedlacek and the acquired businesses with Sedlacek's portion being kicked back to him in the form of "consulting" fees paid to his bogus "consulting" firms.

12.  Sedlacek was involved in at least nine (9) fraudulently inflated acquisitions. . . .

13.  In addition to this conduct, Sedlacek . . . knowingly and intentionally submitted false expense reports and received reimbursement from WebMD for expenses that he did not incur.

18.  Sedlacek made intentional misrepresentations of existing facts to WebMD, or omitted to state material facts, with regard to matters within the course and scope of his duties as a WebMD employee.

19.  Sedlacek knew these representations were false or misleading when made, or made them recklessly without regard to their truth or falsity.

20.  WebMD reasonably relied on Mr. Sedlacek's misrepresentations and suffered damages as a result.

COMPL. at 2-4.

The Plaintiff also relies upon the Debtor's failure to answer questions with respect to his activities at the June 12, 2003 Writ of Possession hearing and again at his deposition on January 26, 2005, as well as his failure to answer the Request for Admissions served by the Plaintiff on January 20, 2005.  In all three instances, rather than answer questions involving (1) his dealings during the acquisitions in question, (2) the creation of Arrow Consulting, Aero Consulting, Strategic Resource Group, Infinity Consulting, and Patrick J. Sedlacek Consulting, and (3) the embezzlement of funds, the Debtor invoked his Fifth Amendment privilege against self-incrimination.  *See* MOT. EXS. 14, 17, 19.

Because the Debtor has not denied any of the fraud or nondischargeability allegations in either the State Court Lawsuit or this adversary proceeding, pursuant to the various rules of civil procedure, these averments and allegations are deemed admitted.  FED. R. CIV. P. 8(d) (applicable in adversary proceedings pursuant to FED. R. BANKR. P. 7008); TENN. R. CIV. P. 8.04; *see also D'Agnese v. Cotsibas (In re Cotsibas)*, 262 B.R. 182, 185 (Bankr. D.N.H. 2001) (averments in an amended complaint were deemed admitted because the defendant failed to answer); *Chemical Bank v. Marcou (In re Marcou)*, 209 B.R. 287, 293 (Bankr. E.D.N.Y. 1997) (the debtor's failure to respond to one paragraph of complaint requiring a response constituted his admission thereof).[9]

The court may, likewise, deem admitted the Request for Admissions served by the Plaintiff on the Debtor on January 20, 2005.  *See* FED. R. CIV. P. 36 (applicable in adversary proceedings pursuant to FED. R. BANKR. P. 7036); *Anthem Life Ins. Co. v. Izaguirre (In re Izaguirre)*, 166 B.R. 484, 488 (Bankr. N.D. Ga. 1994) ("The party to whom a request for admission is directed has the burden to take some affirmative action either to answer the request or to object to it[ and if not,] . . . the request is deemed admitted.").  In his Response to Request for Admissions, out of eighteen admissions, the Debtor admitted two, denied four, and invoked the Fifth Amendment on the remaining twelve.  And, although the Debtor is entitled to plead the Fifth Amendment in this or any civil lawsuit with respect to any information that he reasonably believes presents a real danger of incrimination, *see* U.S.

---

[9] Nevertheless, Rule 8(d) does not include any averments "as to the amount of damage[.]" FED. R. CIV. P. 8(d).

22

Const. amend. V; *Donovan v. Fitzsimmons (In re Morganroth)*, 718 F.2d 161, 167 (6th Cir.

1983), the court may nevertheless draw negative inferences from his doing so. *Fed. Trade

Comm'n v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("Parties are free to

invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse

inferences from their failure of proof.").  Similarly, the Debtor's invocation of the Fifth

Amendment, and thus his failure to answer questions at the June 12, 2003 Writ of

Possession hearing and again at his January 26, 2005 deposition, may lead the court to

assume negative presumptions. *See United States v. 4003-4005 5th Ave.*, 55 F.3d 78. 82-83

(2nd Cir. 1995).  Finally, the court notes that the Debtor did not respond to the Motion for

Summary Judgment with respect to the nondischargeability aspects, and thus, the court will

rule on the record as it stands, without rebuttal evidence from the Debtor.

Based upon the foregoing affidavits, their respective exhibits and attachments, the

transcript of the June 12, 2003 Writ of Possession hearing, the Debtor's January 26, 2005

deposition, the Request for Admissions, and the Debtor's Response to the Request for

Admissions, all of which are unchallenged by the Debtor, the court finds that the Debtor

embezzled funds belonging to the Plaintiff in the aggregate amount of $2,223,181.00, and

that the Plaintiff is entitled to a judgment against the Debtor in that amount, which is

nondischargeable pursuant to § 523(a)(4).  Within the scope of his employment, the

Debtor's responsibilities included negotiating acquisitions, analyzing the value of the

prospective companies, and determining the appropriate purchase price to be paid by the

Plaintiff.  In furtherance of his scheme, the Debtor misrepresented the purchase prices of the

foregoing companies to the Plaintiff.  At the same time, the Debtor misrepresented to the owners of the foregoing companies the necessity to pay consulting fees.  These consulting fees were then diverted to the Debtor through the various consulting firms he set up in order to effectuate his fraud.  Clearly, the funds diverted to the Debtor did not belong to him, but rather, belonged to the Plaintiff.  The Debtor, although authorized to negotiate the acquisition of properties on behalf of the Plaintiff, was not authorized to fraudulently transfer the funds to his own consulting firms for his personal use.

## B

The court also finds that the Plaintiff is entitled to a nondischargeable judgment, as a matter of law, against the Debtor by virtue of § 523(a)(2)(A).  To satisfy this subsection, the Plaintiff must prove that the Debtor obtained funds belonging to the Plaintiff through actual fraud or false representations, other than documents reflecting the Debtor's financial condition,[10] that the Debtor intended to deceive and defraud the Plaintiff, that the Plaintiff justifiably relied on the Debtor's fraud, and that the Plaintiff's reliance was the proximate cause of its losses.  *See Copeland*, 291 B.R. at 760 (citing *Rembert*, 141 F.3d at 280).

---

[10] Section 523(a)(2)(B) provides for nondischargeability of debts incurred through the fraudulent use of statements "respecting the debtor's . . . financial condition[.]"  11 U.S.C.A. § 523(a)(2)(B) (West 2004). "Such financial-type documents relating to a debtor's financial condition include [tax returns,] 'balance sheets, income statements, statements of changes in financial position, or income and debt statements that provide what may be described as the debtor or insider's net worth, overall financial health, or equation of assets and liabilities.'" *Copeland*, 291 B.R. 783 (quoting *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 615 (Bankr. D. Utah 2002)).  On the other hand, documents that do not make representations about the Debtor's financial condition, such as the expense reimbursement requests paid by the Plaintiff and the acquisition documentation, can form the basis for nondischargeability under § 523(a)(2)(A).  *See, e.g., Copeland*, 291 B.R. at 762-63 (examining closing documents for material misrepresentations under § 523(a)(2)(A)).

First, the Plaintiff is required to prove that the Debtor engaged in conduct that was somewhat "blameworthy," and his fraudulent intent may be "inferred as a matter of fact" based on the totality of the circumstances. *Copeland*, 291 B.R. at 759 (citing *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)). Actual fraud, in addition to material misrepresentations, fall within § 523(a)(2)(A)'s scope. *Copeland*, 291 B.R. at 759; *see also Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) ("Actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions.").

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another - something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760 (quoting *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002) and *First Centennial Title Co. v. Bailey (In re Bailey)*, 216 B.R. 619, 621 (Bankr. S.D. Ohio 1997)); *see also Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983) ("For the purposes of § 523(a)(2)(A), false representations . . . encompass statements that falsely purport to depict current or past facts.").

Intent to deceive requires proof that the Debtor made false representations that he knew or should have known would convince the Plaintiff to advance the funds. *Copeland*, 291 B.R. at 765-66. "'Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . . A 'dumb but honest' [debtor] does not satisfy the test.'" *Copeland*,

25

291 B.R. at 766 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)).

Fraudulent intent may be inferred by examining the Debtor's conduct to determine if he

presented the Plaintiff with "'a picture of deceptive conduct . . . indicat[ing] an intent to

deceive.'" *Copeland*, 291 B.R. at 766 (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481,

492 (Bankr. D. Colo. 2002)).

Section 523(a)(2)(A) also requires justifiable reliance by the Plaintiff; i.e., it must

prove that it actually relied on the Debtor's representations and, based upon the facts and

circumstances it knew at the time, such reliance was justifiable.  *Copeland*, 291 B.R. at 767.

Justifiable reliance can be found even if the Plaintiff "'might have ascertained the falsity of

the representation had it made an investigation.'" *Copeland*, 291 B.R. at 767 (quoting

*McCoy*, 269 B.R. at 198).

Finally, the Plaintiff must prove that its reliance on the Debtor's representations was

the proximate cause of its losses, which "depends 'on whether the [debtor's] conduct has

been so significant and important a cause that the [debtor] should be legally responsible.'"

*Copeland*, 291 B.R. at 767 (quoting *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th

Cir. 1991)).  "[T]here must be 'a direct link between the alleged fraud and the creation of

the debt.'" *Copeland*, 291 B.R. at 767 (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27,

32 n.7 (1st Cir. 2001)).

With respect to the improper submission and reimbursement of expenses, between

2001 and 2002, the Plaintiff received expense reports from and paid expenses to the Debtor

26

that he was not entitled to. *See* Mot. Ex. 1 (Am. Compl. at ¶¶ 19-22). In October 2002, the Debtor submitted three invoices for false bulk copying charges, totaling $2,714.65. Mot. Ex. 1 (Am. Compl. at ¶ 19; Ex. C). On three separate occasions, the Debtor submitted for payment, and the Plaintiff paid, duplicate requests for reimbursement for air travel in the total amount of $3,549.31. Mot. Ex. 1 (Am. Compl. at ¶¶ 20-21; Ex. D). Finally, on five separate occasions, the Debtor submitted requests for reimbursement of telephone charges that had previously been reimbursed. Mot. Ex. 1 (Am. Compl. at ¶¶ 22; Ex. E). The Plaintiff paid a total of $2,052.01 for these duplicate charges. Mot. Ex. 1 (Am. Compl. at ¶¶ 22; Ex. E). The aggregate amount of these expenses is $8,315.97.

The Debtor has not challenged any of the Plaintiff's allegations, nor has he offered any evidence to rebut the Plaintiff's exhibits and documentation submitted in support of the Motion for Summary Judgment. Based upon the previously detailed evidence presented by the Plaintiff, the court finds that the Plaintiff has sufficiently proved that the Debtor obtained funds belonging to the Plaintiff, through actual fraud and material misrepresentations, that the Debtor intended to deceive and defraud the Plaintiff, that the Plaintiff justifiably relied upon the Debtor's fraudulent representations, and that the Plaintiff's reliance was the proximate cause of its losses.

At all times, the acquisition funds diverted by the Debtor belonged to the Plaintiff, as did the funds he obtained through his expense reimbursement requests. The Debtor fraudulently induced the Plaintiff to transfer the funds, under the guise that they were the costs of acquisition and reimbursement for incurred expenses, and the only reason the funds

27

were ever in the hands of the other parties was to perpetrate the fraud upon the Plaintiff. Moreover, the Plaintiff relied upon the Debtor's representations concerning the various purchase prices for the independent dealers, and it was justified in doing so, based upon the Debtor's employment for the purpose of acquiring dealers. Likewise, the Plaintiff was also justified in relying upon the expense reports submitted by the Debtor, and the funds derived from those false representations were fraudulently obtained. Finally, it is clear that had the Plaintiff not relied upon the Debtor's representations and actions, it would not have lost the money embezzled by the Debtor, nor would it have paid him for expenses more than once. Accordingly, the court agrees that, pursuant to § 523(a)(2)(A), the Plaintiff is entitled to a nondischargeable judgment against the Debtor in the aggregate amount of $2,231,496.97, representing $2,223,181.00 in funds misappropriated and embezzled by the Debtor through the acquisition of the foregoing companies and $8,315.97 in funds obtained through the false and duplicate expense reports submitted by the Debtor and paid by the Plaintiff.

## IV

In summary, because the Plaintiff has met its burden of proof that, under both § 523(a)(4) and (a)(2)(A), it is entitled to a nondischargeable judgment against the Debtor as a matter of law, the Plaintiff's Motion for Summary Judgment is granted, and the Plaintiff is awarded a nondischargeable judgment against the Debtor in the aggregate amount of $2,231,496.97.

A judgment consistent with this Memorandum will be entered.

28

FILED:  June 1, 2005

BY THE COURT

/s/ *RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE